UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

G&J FISHERIES, INC.,
    Plaintiff,

v.                                                                                              CIVIL ACTION NO. 1:18-12468-LTS

PETER AMARAL &
BHF BLUE EASTERN, LLC,                                                IN ADMIRALTY
    Defendants.

REPORT AND RECOMMENDATION ON PLAINTIFF, G&J FISHERIES, INC.'S
AMENDED AND RESTATED MOTION FOR SUMMARY JUDGMENT (#80), AND
DEFENDANT, BHF BLUE EASTERN, LLC'S CROSS-MOTION FOR SUMMARY
JUDGMENT (#91).

KELLEY, U.S.M.J.

I. Introduction.

This is an admiralty case. Plaintiff, G&J Fisheries, Inc. (G&J), is the owner of the F/V Georges Banks, a commercial fishing vessel operating out of New Bedford, Massachusetts. (#81-1 at 2.) In November 2017, defendant, Peter Amaral (Amaral), injured his lower back while working aboard the Georges Banks as a fisherman. (#1 ¶ 5.) G&J paid Amaral maintenance and cure until October 4, 2018, when his treating physician released him back to work in a full-duty capacity. *Id.* ¶ 7.

Amaral then began working on the F/V Blue Eastern, another fishing vessel based out of Massachusetts, owned by defendant, BHF Blue Eastern, LLC (BHF). *Id.* ¶ 8. At some point in October 2018, Amaral began experiencing back problems again and left BHF's employ, claiming that he was no longer able to work. *Id.* ¶¶ 10–11. On or about November 19, 2018, Amaral, through his counsel, demanded that G&J resume paying him maintenance and cure, which G&J did. *Id.* ¶¶ 12–14. Amaral never made a demand for maintenance and cure against BHF.

1

On November 30, 2018, G&J brought an action for declaratory judgment against both Amaral and BHF pursuant to 28 U.S.C. §§ 2201 *et seq.* and Fed. R. Civ. P. 57, seeking a judgment that it is no longer obligated to pay Amaral maintenance and cure, and that any maintenance and cure owed to Amaral since October 4, 2018, is the responsibility of BHF. *Id.* at 4. Neither Amaral nor BHF filed cross-claims against each other.

On October 25, 2019, G&J filed the present motion for summary judgment, requesting that the court enter judgment declaring that Amaral reached maximum medical improvement (MMI) on October 4, 2018, and that "G&J was not, and is not liable to pay Amaral maintenance and cure since that time[.]" (#80 at 2.)[1] On November 22, 2019, BHF filed a cross-motion for summary judgment, also arguing that Amaral has reached MMI, and disputing that it is responsible for any maintenance and cure payments to Amaral. (#91 at 1.) The motions have been fully briefed (##81, 82, 92, 93, 94, 95, 96, 97, 105, 106, 107, 108, 109, 112), and are poised for disposition.

## II. Facts.

The following facts are undisputed unless otherwise indicated. Amaral, who is in his early forties, has been a commercial fisherman since approximately 2002. (#81-2 at 5; #81-16 at 2.) In addition to the Georges Banks, Amaral worked onboard multiple fishing vessels throughout his career. (#81-2 at 3–4.) Amaral's work as a commercial fisherman was repetitive; his responsibilities included picking up baskets of scallops from dredges and then dumping them into separate boxes to be shucked. *Id.* at 5. Amaral estimated that each basket of scallops weighed between 60–80 pounds. *Id.* at 7.

---

[1] Amaral previously filed a motion for summary judgment on June 24, 2019 (#39), which has since been withdrawn. (#78.) G&J had already filed an opposition to Amaral's motion and a cross-motion for summary judgment. (#52.) The court instructed G&J to file an amended motion incorporating its previously filed cross-motion and any supplemental briefing (##79, 85), which G&J did in its present motion.

Amaral was not a regular Georges Banks' crewmember but, rather, filled in on approximately four trips in the 2017 calendar year. (#81-3 at 2.) During his fourth and final trip aboard the Georges Banks, around November 16th or 17th, Amaral informed Rui Branco, the Master of the Georges Banks, that he had injured his back lifting a basket of scallops. *Id.*[2] Specifically, Amaral stated that "there was a big pop in [his] back[,]" and he "lost [the] strength [and] sensation in his legs." (#97-2 at 2.) Branco offered Amaral ibuprofen and icepacks and instructed Amaral to rest for the remainder of the trip. (#81-3 at 2.) Amaral has not worked on the Georges Banks since November 17, 2017. *Id.*

After he left the Georges Banks on November 17, 2017, Amaral's wife brought him to the Emergency Department at St. Luke's Hospital. (#81-4 at 13.) At that point, Amaral was complaining of "diffuse lower back pain . . . ." (#81-16 at 2.) An x-ray of Amaral's lumbar spine taken that day revealed "[m]ild multilevel degenerative charges with marginal osteophytes and facet hypertrophic changes" and "[m]ild vascular calcifications[,]" but "[n]o acute fracture or dislocation." (#81-19 at 6.)

Amaral followed up with his PCP, Stephen Mackler, M.D., on November 20, 2017. (#81-17 at 2.) He continued to complain of lower back pain, radiating down his left leg. *Id.* at 4. Dr. Mackler referred Amaral to a neurosurgeon and ordered a lumbar spine MRI. *Id.* at 5. On November 29, 2017, Amaral underwent his lumbar spine MRI, which revealed "[s]pondylosis[,] most prominently noted [at] L4-L5 with mildly more focal extruded disc material and an annular fissure." (#81-18 at 2, 4, 6.)

---

[2] Amaral stated in his interrogatory responses that he also "slipped and fell in the hold . . . while walking on the propeller shaft cover" during either his first or second trip on the Georges Banks, earlier in 2017. (#97-1 at 3.) However, he never informed Branco about this previous incident. (#81-3 at 2.)

On December 14, 2017, Amaral began treating with a neurologist, Matthew F. Phillips, M.D. (#81-19 at 2–9.) At this point, Amaral continued to experience back and leg pain, but it had improved since his visit to the Emergency Department. *Id.* at 2. Dr. Phillips diagnosed Amaral with a lumbar disc bulge without myelopathy and back pain with left-sided radiculopathy and suggested various treatment options. *Id.* at 6. As of the date of his last visit on April 17, 2018, Dr. Phillips indicated that Amaral had "tried physical therapy, NSAIDS, spinal injections[,] and ESI without improvement." (#81-20 at 4.) Dr. Phillips' overall impression was that Amaral's condition was "unchanged[.]" *Id.* at 3.

Frustrated that his condition was not improving, Amaral sought a second opinion with Eugenio Martinez, M.D., who is board-certified in physical medicine and rehabilitation and affiliated with the New England Baptist Hospital. (#81-4 at 18; #81-8 at 5–6.) During Amaral's first visit with Dr. Martinez, on May 3, 2018, Dr. Martinez assessed Amaral with acute left-sided back pain with left-sided sciatica, piriformis syndrome on the left side, and myofascial pain. (#81-21 at 4.) Despite the fact that his previous physical therapy regimen had been unsuccessful, Dr. Martinez recommended that Amaral participate "in a brief course of exercise-based physical therapy" to improve his spinal function. *Id.* at 6. Dr. Martinez also prescribed a brief course of prednisone and recommended that Amaral undergo an updated lumbar MRI study. (#81-22 at 2.)

Amaral presented to Dr. Martinez for a follow-up visit on August 9, 2018. *Id.* at 2–4. Amaral had not begun his physical therapy regimen, and he denied any improvement in his symptoms after completing his course of prednisone. *Id.* at 2–3. Amaral's updated MRI revealed "[v]ery mild single level disc herniation . . . at L4-5," but "no focal herniation, lateral recess, central canal or foraminal narrowing, i.e. nerve root impingement." *Id.* at 2. Dr. Martinez again

recommended that Amaral consider a physical therapy regimen and also discussed "the option of a CT-guided piriformis trigger point injection[.]" *Id.* at 3.

Amaral completed his physical therapy regimen and presented to Dr. Martinez again on October 4, 2018. (#81-23 at 2.) Amaral reported that he was "essentially pain free" and that he felt that he was "ready to resume his usual occupational duties as a fisherman." *Id.* At that point, Dr. Martinez believed that Amaral "had reached maximum medical improvement[.]" (#81-8 at 30); *see also* #81-8 at 35, 37–38. Following the visit, Dr. Martinez signed a work release, permitting Amaral to return to work on October 5, 2018 in a full-duty capacity. (#81-24 at 2.)[3]

In October 2018, Amaral began working on the Blue Eastern (owned by BHF), with his first trip beginning around October 15th and his second trip beginning around October 27th. *See* #81-9 at 2–7; #81-10 at 2–7. When signing his contracts for both the October 15th and October 27th voyages, Amaral stated he submitted "complete and truthful 'Pre-Trip Medical Questionnaire[s].'" (#81-9 at 3; #81-10 at 3.) However, in the questionnaires for both trips, Amaral answered "no" when asked whether he had ever experienced any back pain. (#81-9 at 6; #81-10 at 6.) Amaral testified at his deposition that he did not disclose his back issues because he "wasn't questioned about any back injury." (#97-2 at 12.) Mike Rego, the son of the captain of the Blue Eastern, filled out the questionnaires and completed the contracts for him, due to the fact that he was "not a very good reader or speller[,]" and Rego already "knew [he] had been out of work for a year due to a back injury." *Id.* at 11–13. The only time Amaral actually put a pen to paper was when he signed the contracts for both voyages. *Id.* at 13.

---

[3] Branco (the Master of the Georges Banks) had been informed that Amaral had been cleared to work around October 4, 2018. (#81-3 at 2.) However, to Branco's knowledge, Amaral never sought to return to work on board the Georges Banks after receiving his clearance. *Id.*

Amaral testified that he did not experience pain during his first trip aboard the Blue Eastern, because he was not required to perform any manual labor due to a problem with the vessel. (#81-4 at 22; #81-9 at 2; #93-9 at 2.) However, once he started performing physical labor during his second trip in late October, his back "pain came right back" (#97-2 at 18), progressing to the point where he needed to leave the voyage early. (#81-11 at 2.) Amaral described his pain as "the same pain I had when I got injured on the Georges Bank[s]." (#93-11 at 2.) Despite his back issue, Amaral reported in an "end of . . . trip statement" that he "did not sustain an injury or illness during [his t]rip" on the Blue Eastern. (#93-13 at 2.) Amaral also testified that, in his opinion, he did not suffer a second injury or accident aboard the Blue Eastern. (#93-14 at 2.) Rather, the back pain he was experiencing resulted from his reported incident on the Georges Banks. *Id.* at 2–3; *see also* #93-15 at 3; #93-20 at 2–3.[4]

On October 31, 2018, Amaral followed up with Dr. Martinez again. (#81-25 at 2–6.) Dr. Martinez opined that Amaral had "ongoing latent myofascial dysfunction which was simply exacerbated by return to normal work activity in the past few weeks." *Id.* at 3. He noted that Amaral was unable to perform his usual job duties at that time and referred him for another course of physical therapy. *Id.* On November 25, 2018, Dr. Martinez authored a note, stating that, in his "medical opinion, within a reasonable degree of medical certainty, [Amaral's] present medical condition [was] causally connected to the injury which occurred . . . while working as a crew member on the [F/V] Georges Bank[s]. There was no specific, intervening injury and thus his inability to work and ongoing need for treatment is related on the injury on [November 17, 2017]." (#93-6 at 2.) Dr. Martinez also testified at his August 28, 2019 deposition that Amaral's return to work in October 2018 aggravated his pre-existing back condition. (#81-8 at 36–37.)

---

[4] Amaral indicated the same in his responses to G&J's interrogatories. (#93-17 at 2.)

6

Amaral last visited Dr. Martinez on December 19, 2018. (#81-26 at 2–4.) Amaral was still participating in physical therapy at that time but denied any major improvement in his symptoms. *Id.* at 2. He was also taking nortriptyline, an anti-depressant know to alleviate back pain and aid sleep, "without any obvious benefit." *Id.* at 2–3. Amaral testified that he was not aware of anything Dr. Martinez could do to improve his condition. (#81-4 at 26.) Similarly, Dr. Martinez testified that, as of the date of Amaral's last visit, he did not have any "definitive curative treatment for him[.]" (#81-8 at 42.) However, Dr. Martinez still believed that physical therapy could be beneficial to Amaral and noted that, prior to his last visit, Amaral had been "demonstrating gradual progress from an objective standpoint." *Id.* at 40–42.[5] Amaral has not consulted with Dr. Martinez since December 19, 2018. *Id.* at 26.

Despite Dr. Martinez's recommendations, Amaral stopped participating in physical therapy after his last visit with Dr. Martinez. *See* #81-4 at 26; #81-27 at 3. He visited several other physicians after Dr. Martinez, but none prescribed any treatment options that could alleviate his pain. On June 12, 2019, Amaral visited a neurosurgeon, Herbert Lionel Cares, M.D., who had been recommended by Dr. Mackler. (#81-27 at 2–4.)[6] After he examined Amaral, took a medical history, and reviewed Amaral's previous medical records, Dr. Cares opined that there were few treatment options available to Amaral besides potential physical therapy. Specifically:

> Assuming there is no occult instability here, I don't see a role for surgery. . . . In my experience, an instrumental fusion for axial pain in the presence of inorganic signs almost always is unsuccessful and is fertile ground for postiaminectomy syndrome (AKA failed back). I suggested that he try any other alternative.

---

[5] Dr. Martinez further noted that he considered physical therapy to be a curative treatment for Amaral's condition, rather than simply palliative. (#81-8 at 20–21.)

[6] Amaral testified that he had also visited a "Dr. Gutting" after stopping his treatment with Dr. Martinez. (#81-4 at 26.) Dr. Gutting's available records are overall consistent with the records of Dr. Phillips, Dr. Martinez, and Dr. Cares. *See* # 42-7. However, Dr. Cares noted in his chart that "Dr. Gutting apparently recommended an instrumental fusion[.]" (#81-27 at 2.)

7

> Unfortunately one of the best alternatives, exercise-based physical therapy, has already been tried, so the only option I see for him is to work in a job that he can tolerate.

*Id.* at 3–4.

Amaral indicated in his written answers to G&J's interrogatories, dated March 15, 2019, that he "is currently disabled and has not been able to return to work as a commercial fisherman since attempting to do so aboard the" Blue Eastern. (#81-5 at 3.) He testified at his August 2019 deposition that he had since been treating with a pain management physician and received 2–3 "nerve-blocking" injections, but they had yet to do anything to improve his pain. (#81-4 at 5–6.) Other than getting the injections from the pain management physician, Amaral was not receiving any other treatment for his back pain as of the date of his deposition. *Id.* at 9, 11–12. It is Amaral's understanding that the injections are his only viable treatment option besides potential surgery in the future. (#81-4 at 28–29.)[7]

### III.  Standard of Review.

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail on a motion for summary judgment, the moving party bears the initial burden of averring the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citations omitted). Once the moving party asserts the absence of a genuine issue of material fact, the non-movant must demonstrate the existence of a factual dispute

---

[7] Specifically, Amaral testified that both Dr. Cares and Dr. Gutting from St. Elizabeth's informed him that, although spinal surgery may be his only option later on, it was "absolutely not" a good idea at this point in time because there are "too many risks involved" and it would not "benefit [him] in any way . . . ." (#81-4 at 28.)

with requisite sufficiency to proceed to trial. *Fontánez-Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 54–55 (1st Cir. 2006). "[C]onclusory allegations, improbable inferences, . . . or rank speculation" cannot alone defeat summary judgment. *Miceli v. JetBlue Airways Corp.*, 914 F.3d 73, 81 (1st Cir. 2019) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).

In determining whether summary judgment is proper, courts view the record in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in the non-movant's favor. *Caraballo-Caraballo v. Corr. Admin.*, 892 F.3d 53, 56 (1st Cir. 2018) (citations omitted). Upon a party's motion, Rule 56 requires the entry of summary judgment when the nonmoving party fails to establish the existence of any one essential element on which he will bear the final burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal citations and quotation marks omitted).

Where, as here, two parties have cross-moved for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Selfridge v. Jama*, 172 F. Supp.3d 397, 415 (D. Mass. 2016) (quoting *Bienkowski v. Northeastern Univ.*, 285 F.3d 138, 140 (1st Cir. 2002)). Summary judgment is appropriate if "either of the parties deserves judgment as a matter of law on facts that are not disputed." *Id.* (quoting *Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001)).

IV. Legal Analysis.

A. G&J's Motion for Summary Judgment (#80).

G&J argues that the court should declare that Amaral reached MMI for his diagnosed back condition on October 4, 2018, the day that Dr. Martinez released him to return to work, and that "G&J was not, and is not liable to pay Amaral maintenance and cure since that time." (#82 at 1-2.) As set out below, the court recommends that judgment be entered in favor of G&J, declaring that Amaral reached MMI on October 4, 2018, and that G&J is no longer liable to Amaral for maintenance and cure payments.[8]

It is well-settled that "[t]he owner of a vessel has a duty to pay maintenance and cure to a seaman 'who is injured or fall[s] ill while in service of the ship.'" *Ramirez v. Carolina Dream, Inc.*, 760 F.3d 119, 122 (1st Cir. 2014) (quoting *Whitman v. Miles*, 387 F.3d 68, 72 (1st Cir. 2004)).[9] A vessel's duty of maintenance and cure applies until the seaman is "so far cured as possible." *Whitman*, 387 F.3d at 72 (quoting *Farrell v. U.S.*, 336 U.S. 511, 518 (1949)). The First Circuit has explained the concept of being "so far cured as possible" in terms of "maximum medical improvement" (MMI) or "maximum medical recovery":

> The duty of maintenance and cure applies until the seaman has fully recovered or is "so far cured as possible," *Farrell*, 336 U.S. at 518 – the latter alternative taking into account that the seaman's condition might stabilize short of full health. The obligation to pay maintenance and cure is thus described as extending until the seaman reaches "maximum medical recovery." *Vaughn* [*v. Atkinson*], 369 U.S.

---

[8] G&J concedes that "issues of fact exist as to . . . reimbursement from [BHF] for [the] maintenance and cure paid between October 4, 2018 and the present time[,]" and argues that "reimbursement can be addressed following an entry of summary judgment against Amaral closing the maintenance and cure period[.]" (#82 at 2 n.1.)

[9] "'Maintenance' refers to the cost of food and lodging during the period of illness or recovery from injury, and 'cure' covers the reasonable medical expenses incurred for the seaman's treatment." *Ramirez v. Carolina Dream, Inc.*, 760 F.3d 119, 122 (1st Cir. 2014) (citing *Alt. Sounding Co. v. Townsend*, 557 U.S. 404, 413 (2009), and *Whitman v. Miles*, 387 F.3d 68, 71 (1st Cir. 2004)).

> [527,] 531 [(1962)]; *see also e.g.*, *Haskell* [*v. Socony Mobil Oil Co.*], 237 F.2d [707,] 709 [(1956)] (explaining that "cure" is "cure in the sense of care until medical science can do no more"); Robert Force, Federal Judicial Center, Admiralty and Maritime Law 94 (2d ed. 2013) (defining the cutoff point as "when the condition is cured or declared to be incurable or of a permanent character").

*Ramirez*, 760 F.3d at 123; *see Block Island Fishing, Inc. v. Rogers*, 844 F.3d 358, 364 (1st Cir. 2016); *In re RJF Int'l Corp. for Exoneration from or Limitation of Liab.*, 354 F.3d 104, 106 (1st Cir. 2004). "[W]here it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved." *In re RJF Int'l Corp.*, 354 F.3d at 106 n.1 (quoting *Pelotto v. L&N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979)).

The shipowner bears the burden of proving that MMI has been reached, by way of opinion from the seaman's treating physicians. *See Hubbard v. Faros Fisheries, Inc.*, 626 F.2d 196, 202 (1st Cir. 1980) (quoting *Vitco v. Joncich*, 130 F. Supp. 945, 949 (S.D. Cal. 1955) ("The shipowner's obligation to furnish maintenance . . . is (not) discharged until the earliest time when it is reasonably and in good faith determined by those charged with the seaman's care and treatment that the maximum medical cure possible has been effected.")); *Meade v. Skip Fisheries, Inc.*, 385 F. Supp. 725, 727 (D. Mass. 1974) (citing *Vaughn*, 369 U.S. 527); *Saco v. Tug Tucana Corp.*, 483 F. Supp.2d 88, 99–100 (D. Mass. 2007).

There is no dispute of material fact that Amaral had reached MMI on October 4, 2018. Amaral's only treating physician at the time, Dr. Martinez, unequivocally testified that Amaral "had reached maximum medical improvement" as of that date (#81-8 at 30); *see also id.* at 35, 37–

11

38, and released him to return to work in a full-duty capacity. (#81-24 at 2.) Amaral offers no evidence to the contrary.[10] Therefore, G&J's duty of maintenance and cure ended.

The fact that Amaral may have reaggravated or, as Dr. Martinez stated, "exacerbated[,]" his back injury while aboard the Blue Eastern does not matter. The First Circuit has held that the issue of whether a seaman has reached MMI "is not one of causation, but of timing: did the illness for which the seaman seeks maintenance and cure begin or become aggravated while he was 'serving the ship?'" *Ramirez*, 760 F.3d at 124–25 (quoting *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001)).[11] While Amaral's original back injury may have occurred when he was working on the Georges Banks, it was aggravated or exacerbated when he was working on the Blue Eastern, after Dr. Martinez had already unequivocally determined he was at MMI. *See Meade*, 385 F. Supp. at 727, 728 (citation omitted) (noting that "[t]he obligation to 'cure' imports a responsibility only to finance maximum recovery, not to insure a seaman . . . for life[,]" and when neither vessel is at fault, courts should "let the loss lie where it falls").

B. BHF's Cross-Motion for Summary Judgment (#91).

BHF argues in support of its cross-motion for summary judgment that, despite Amaral's aggravation of his back injury while aboard the Blue Eastern, it should not be liable for maintenance and cure payments. (#92 at 1–2.) It joins in G&J's argument that "Amaral had reached [MMI]" as of October 4, 2018, *id.* at 5, and argues for the first time in its reply brief that, even if Amaral was no longer at MMI after aggravating his back injury in late October, "Amaral reached

---

[10] In fact, Amaral admitted that he had briefly reached a period of MMI on October 4, 2018, in his memorandum in opposition to G&J's motion. *See* #96 at 2, 4.

[11] Consistent with the First Circuit's definition of MMI, Dr. Martinez characterized MMI as a "timeline[,]" and noted that just because a seaman has "an aggravation [of an injury] that occurs after [MMI does not] necessarily mean that [he was not] at [MMI] before." (#81-8 at 37.) Dr. Martinez testified that MMI is "a point in time [and y]ou don't revise it. . . . So[,] if somebody is at [MMI], they're at [MMI]." *Id.*

MMI by December 19, 2018[,] because numerous medical providers examining him after [that date] opine that [his] treatment is nothing more than pain management and he is not a candidate for surgery." (#112 at 1.) BHF maintains that, in addition to being at MMI, Amaral did not sustain any new injuries aboard the Blue Eastern, and "Amaral intentionally concealed his back injuries prior to joining the" Blue Eastern crew. (#92 at 2.)

BHF also points out that, unlike G&J, Amaral has never made a claim for maintenance and cure against it, either directly or by cross-claim in this action. *Id.* at 2. The parties have not briefed the issues of whether BHF can be liable to G&J for reimbursement in these circumstances, or if BHF can raise defenses to a claim for maintenance and cure it may have against Amaral, for example, that he intentionally hid his back injury, against G&J in its claim for reimbursement. Assuming, without deciding, that BHF could be liable to G&J and could raise the defenses, BHF's motion for summary judgment contains the following issues of fact warranting denial.

BHF's argument that Amaral was at MMI when working aboard the Blue Eastern fails. While it is clear Amaral was at MMI when Dr. Martinez examined him on October 4, 2018, Dr. Martinez specifically testified that Amaral was no longer at MMI after he aggravated his back injury later that month while working aboard the Blue Eastern. (#81-8 at 37–38.)

BHF's argument that Amaral reached MMI again on December 19, 2018, also fails. After the October 4th determination by Dr. Martinez, no treatment provider determined that Amaral had reached MMI as of any date, or specifically diagnosed Amaral's back condition as not being susceptible to curative treatment. *See Hubbard*, 626 F.2d at 202; *Meade*, 385 F. Supp. at 727; *Saco*, 483 F. Supp.2d at 99–100 (noting that it is the shipowner who bears the burden of proving MMI, with opinions from the seaman's treating physicians); *Ramirez*, 760 F.3d at 125 (internal citations, quotation marks, and alterations omitted) (noting that any "ambiguities or doubts are resolved in

favor of the seaman"). In fact, Dr. Martinez testified that physical therapy—a curative, rather than a palliative, treatment—could potentially improve Amaral's condition in the future. (#81-8 at 40–42.) According to Dr. Cares' records, there appears to be some dispute between Dr. Cares and Dr. Gutting as to whether surgery could be a curative option in the future. *See* #81-27 at 2–4. There are genuine issues of material fact as to when, or even if, Amaral ever reached MMI again after October 4, 2018.

BHF's remaining arguments are unavailing. Although Amaral may have originally injured his back when working aboard the Georges Banks and not the Blue Eastern, as both Amaral and Dr. Martinez have repeatedly stated, *see, e.g.,* 93-15 at 3; #93-20 at 2–3; #93-17 at 2; #93-6 at 2; #109 at 4, the First Circuit has made clear that "the duty to pay maintenance and cure 'arises when [the seaman] is taken ill from whatever cause during a voyage.'" *Ramirez*, 760 F.3d at 125 (quoting *Haskell*, 237 F.2d at 709)."The origin or cause of" the seaman's disability, or the fact that the disability "pre-existed" the subject voyage, "originated on another vessel" (as here), "or even was due to the fault of another vessel . . . are all irrelevant." *Meade*, 385 F. Supp at 727.

There are also genuine issues of material fact as to whether "Amaral intentionally concealed his back injuries prior to joining the" Blue Eastern crew. (#92 at 2.) "As a general rule, a shipowner has no obligation to pay maintenance when a seaman fraudulently conceals a relevant medical condition." *Block Island Fishing Inc. v. Rogers*, 149 F. Supp.3d 214, 215 n.4 (D. Mass. 2016) (citing *McCorpen v. Central Gulf S.S. Corp.*, 396 F.2d 547, 548 (5th Cir. 1968), *aff'd in part and vacated in part on other grounds*, *Block Island*, 844 F.3d 358. The First Circuit has held that "maintenance and cure may still be awarded notwithstanding a pre-existing condition so long as that condition is not deliberately concealed and is not disabling at the time the seaman signs on for the voyage." *Dillon v. U.S.*, 357 F. Supp.3d 49, 61 (D. Mass. 2019) (quoting *Ramirez*, 760 F.3d at

123). The term "disabling," in context, "appears to mean that it would prevent a seaman from performing his duties on a voyage." *Id.* (citing *DiBenedetto v. Williams*, 880 F. Supp. 80, 86 (D.R.I. 1995)). The district court has previously explained:

> [A] seaman who may not be aware of the full extent of his disease and therefore fails to disclose the condition is less culpable than one who engages in an "affirmative misrepresentation." [*Hazelton v. Luckenbach Steamship Co.*, 134 F. Supp. 525, 527 (D. Mass. 1955)]. Disclosure is also only required "when, in the opinion of the seaman, the shipowner would consider [the prior medical condition] matters of importance." *Lorensen* [*v. Jenney Mfg. Co.*], 155 F. Supp. [213,] 214 [(D. Mass. 1957)]. If, however, the seaman's belief that he is fit for service or that his condition is immaterial is unreasonable, the seaman has no justification for failing to disclose and this would rise to the level of an affirmative misrepresentation that would relieve a shipowner of liability. [*Hazelton*, 134 F. Supp.] at 527–28; *see also Fardy* [*v. Trawler Comet, Inc.*], 134 *F. Supp.* [528,] 529 [(D. Mass. 1955)].

*Id.* at 61–62.

Here, it was reasonable for Amaral to believe that his back condition would not be disabling prior to his voyage aboard the Blue Eastern. Just before he signed his crew contracts, Amaral reported that he was "essentially pain free[,]" and "ready to resume his usual occupational duties as a fisherman[,]" and Dr. Martinez concluded that he was at MMI. (#81-23 at 2; #81-8 at 30.) There are also issues of fact as to whether Amaral deliberately concealed his back injury. Although Amaral indicated when he signed his crew contracts that he understood and agreed that his truthful "disclosure of prior and current physical injuries" to BHF in the Pre-Trip Medical Questionnaires was "material to [BHF's] decision to hire" him, and that his failure to disclose any current injuries could result in his forfeiture of his maintenance and cure benefits, *see* #81-9 at 3, #81-10 at 3, the record is unclear as to whether Amaral knew what he was signing. Amaral testified that he was never questioned about any back injury, that he was "not a very good reader or speller[,]" and that Mike Rego, the captain's son, who had already been aware of his previous back injury, had filled out all of his paperwork for him.

V.  Conclusion.

For the reasons stated above, it is recommended that plaintiff, G&J Fisheries, Inc.'s motion for summary judgment (#80) be granted to the extent that G&J is entitled to a declaration that defendant, Peter Amaral, reached MMI on October 4, 2018, and that G&J is no longer to liable to Amaral for maintenance and cure payments. It is further recommended that defendant, BHF Blue Eastern, LLC's cross-motion for summary judgment (#91) be denied.

VI.  Review by District Judge.

The parties are hereby advised that any party who objects to this recommendation must file a specific written objection thereto with the Clerk of this Court within fourteen days of service of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *U.S. v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *U.S. v. Vega*, 678 F.2d 376, 378–79 (1st Cir. 1982); *Park Manor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).


October 15, 2020                                             /s/ M. Page Kelley
                                                             M. Page Kelley
                                                             Chief United States Magistrate Judge